UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 26-24140-CV-MIDDLEBROOKS
(CASE NO. 25-20103-CR-MIDDLEBOOKS)

BRETT GRAHAM,

Movant,

v.

UNITED STATES OF AMERICA,

Respondent.
_________________________________/

THE UNITED STATES OF AMERICA'S BRIEF IN
OPPOSITION TO MOVANT'S MOTION TO VACATE SENTENCING

Over the course of four years, Movant stole nearly every penny his elderly, widowed, cognitively-impaired family member had. He used the money, approximately $8.4 million, to travel the world, stay at luxury spas and resorts, and live in opulent residences. He was sentenced to 84 months' incarceration, a sentence in the middle of his Guidelines range. He was represented throughout his prosecution by capable counsel who presented the best arguments she could while dealing with an unsympathetic defendant and a heinous crime. Movant now claims, *inter alia*, that defense counsel violated his Six Amendment rights by failing to find a medical "expert" who could have opined that complications stemming from a heart surgery years earlier put him in such a "zombie state" that he didn't fully appreciate the wrongness of his conduct and, based on that expert opinion, the Court would have given him a below Guidelines sentence. Because his arguments fail legally, and because his motion offends shared notions of justice, his requested relief must be denied.

## PROCEDURAL BACKGROUND

*Criminal Offense*

The following is based on the Factual Proffer and those portions of the Presentence Investigation Report that are uncontested.

Movant was a financer until approximately 2015, when he was disciplined by the U.S. Securities & Exchange Commission (CDE 48 ("PSR") ¶ 12) He was thereafter unemployed, but did private investing of his own. (PSR ¶ 12, 73)

In approximately 2017, Movant's elderly family member ("Family Member-1") became a widow and began to rely on Movant to assist with her affairs, including by selecting a financial advisor. (PSR 14) Family Member-1 later developed dementia. Although Movant was charged with helping her and serving as her Power of Attorney, he proceeded to steal nearly every dollar she had, approximately $8.4 million. (PSR ¶ 11.)

Movant began stealing from Family Member-1 in approximately September 2019. In September and October 2019, Movant transferred approximately $225,000 from a savings account in Family Member-1's to his own brokerage account. (PSR 18). The next month, having depleted Family Member-1's savings account, Movant began depleting a brokerage account he managed on Family Member-1's behalf. (PSR ¶ 15, 17-18.)

In approximately 2020, amidst COVID-19 lockdowns, Movant moved with his partner from New York, New York, to Miami, Florida. (PSR ¶ 12)

In or around May 2020, Movant began affirmatively lying to steal Family Member-1's money. On or about May 4, 2020, Movant emailed representatives of Financial Advisor-l and asked them to make available for transfer an additional $500,000 belonging to Family Member-1. In an email dated May 4, 2020, Movant wrote that the money "will be used for both directed

(private) and more opportunistic investing." This was untrue. Movant spent the resulting proceeds for his personal benefit. (PSR ¶ 20)

In approximately November 2020, Movant became Family Member-1's power of attorney. (PSR ¶ 21) He was obligated to act in her best interest. (*Id.*)

On or about December 15, 2020, Movant emailed Financial Advisor-1 the executed Power of Attorney. The Power of Attorney, signed by Movant and Family Member-1, stated:

> You must (1) act according to any instructions from the principal, or, where there are no instructions, in the principal's best interest; (2) avoid conflicts that would impair your ability to act in the principal's best interest; (3) keep the principal's property separate and distinct from any assets you own or control[;] [and] (4) keep a record or all receipts, payments and transactions conducted for the principal[.]

(PSR ¶ 21)

In addition, the Power of Attorney stated, "You may not use the principal's assets to benefit yourself or anyone else or make gifts to yourself or anyone else unless the principal has specifically granted you that authority in this document[.]" No such authority was granted in the document. (PSR ¶ 21)

In his email attaching the Power of Attorney, Movant asked Financial Advisor-1 to make available an additional $250,000. Movant explained that the money was needed to pay for Family Member-1's "higher medical & care expenses[.]" Movant, however, moved the resulting proceeds and spent it on himself. (PSR ¶ 22)

On January 21, 2021, Movant transferred $100,000 from his mother's savings account to his personal checking account. The next day, January 22, 2021, he transferred all $100,000 to his American Express. The charges on this card at the time included stays at spas and/or resorts in the Bahamas, St. Tropez, and California, and private airfare. (PSR ¶ 23.)

In or around March 2021, Movant sold a valuable piece of real estate he owned in the Hamptons region of New York. On or about March 29, 2021, Movant received the sale proceeds,

over $2.6 million. He did not return any proceeds to Family Member-1's accounts. (PSR ¶ 24)

On approximately November 21, 2022, Movant emailed Financial Advisor-1 employees and asked that they "make $400,000 available to transfer from [Family Member-1's] account at your earliest convenience." A Financial Advisor-1 employee replied that "with this distribution, [Family Member-1] will have withdrawn nearly $2,500,000 from her portfolio in 2022." The employee wrote that anticipated withdrawal was much less. He added, "We are concerned about [Family Member-1's] overall financial plan, and are afraid that we might be missing some key information in generating our projections." Movant replied, "Please work to make the funds available[.] Amazing opps in follow-on P/E. This will pretty much fill my idea of allocation." (PSR ¶ 25)

Movant did not invest the resulting proceeds on Family Member-1's behalf. Rather, after transferring the money to his account, he paid over $14,000 to an art gallery; over $202,000 towards his black American Express; approximately $60,000 for private airfare; and approximately $30,000 for rent. (PSR ¶ 26) At the time, Movant rented a four bedroom, five bath condominium in Miami, Florida, spanning approximately 4,600 square feet. (*Id.*)

On approximately April 12, 2023, Movant again emailed employees of Financial Advisor-1: "Can you please make $800,000 available in [Family Member-1's] account over the next week, it will be re-allocated in fixed income so maybe take that as a direction where to pull from." (PSR ¶ 27) Movant transferred the resulting $800,000 to his account between April 14 and April 24, 2023. Over the course of that week, Movant paid $532,466.99 towards his American Express bill. Recent charges included $96,330 at Bulgari in Miami, Florida; $12,717.60 at a resort in St. Bart's; and $352,500 at Bulgari in New York, New York. (*Id.*)

On approximately June 15, 2023, Movant asked that Financial Advisor-1 make $500,000

available. (PSR ¶ 28) An employee of Financial Advisor-1 replied on June 20, 2023: "Are you investing this money elsewhere? I only ask because her liquid funds are on pace to deplete in the next few years instead of the next 9-10 years that we had hoped for her." Movant did not immediately reply. But between June 20 and June 22, 2023, Financial Advisor-1 employees transferred $500,000. Movant moved all of it to his checking account. Movant spent the majority of the proceeds on his American Express. Recent charges took place in Milan, Italy, and Cannes, France. (*Id.*)

On approximately July 19, 2023, Movant replied to the employee's June 20th email. He wrote that he was investing the money on his mother's behalf and explained that he was "allocating investments mirroring things I am doing. Along those lines could you please make $300k available in [Family Member-1's] account by end of week? The longer term plan is that I'd expect to begin funneling funds back in your direction – this time next year as expected distributions kick in." (PSR ¶ 29)

Between July 21 and 24, 2023, Financial Advisor-1 employees transferred $300,000. Between July 24 and 31, 2023, Movant moved $250,000 to his personal checking account. He spent nearly all of it—$247,262.94—on his American Express. (PSR ¶ 30)

Movant continued to deplete his family member's accounts. On approximately December 4, 2023, after a conversation with a Financial Advisor-1 employee, Movant instructed Financial Advisor-1 to "liquidate [his family member's] non-IRA account" and transfer control of her IRA to him. (PSR ¶ 30) Financial Advisor-1 subsequently terminated its services agreement with Family Member-1. Movant moved the remaining non-IRA funds into his own checking account and, in December 2023, paid over $244,000 toward his American Express bill and $35,000 towards rent. (*Id.*)

By 2024, Movant had spent all of his mother's available assets and needed to borrow money from his girlfriend to pay for his family member's assisted-living facility. Movant's girlfriend paid one year of fees up front on behalf of his family member. (PSR ¶ 31)

*Indictment & Change of Plea*

On or about March 6, 2025, a federal grand jury indicted Movant. The indictment alleged three counts of wire fraud, in violation of 18 U.S.C. § 1343, and five counts of money laundering, in violation of 18 U.S.C. § 1957(a). (CDE 3)

On or about May 13, 2025, Movant pled guilty to one count of wire fraud before Magistrate Judge Torres. (CDE 29) Movant executed a Plea Agreement and Factual Proffer. In the Plea Agreement, Movant agreed to plead guilty to one count of wire fraud; in response, the United States agreed to move to dismiss the remaining counts against defendant after sentencing. (CDE 26 ¶ 2).

During the Change of Plea Hearing, Movant stated under oath that he was a college graduate, that he previously worked in finance, and that he had never been treated for either "any type of mental illness" or "any type of addiction to drugs or substances." (Hr'g Tr. 4) Movant stated that he was "satisfied with the representation and advice [he] received from [his] lawyer[.]" (*Id*. at 5.) Movant was made aware of the rights he was waiving, the burden the government would face at trial, and the elements of Wire Fraud. (*Id*. at 11) The Court walked through Movant's Plea Agreement and had the government provide a factual basis for the plea. (*Id*. at 13-15) Movant admitted that he "made numerous misrepresentations" to obtain Family Member-1's money and that he was pleading guilty because he was "in fact guilty of th[e] offense[.]" (*Id*. at 16-17) Judge Torres informed the Defendant that, "on the date of sentencing, you have a right to provide Judge Middlebrooks with any other information or evidence necessary for him to render a fair and just

sentence in your case. Do you understand all that, Mr. Graham?" Movant replied, "I do, your Honor." (*Id.* at 19)

*Pre-Sentencing Filings*

On or about July 10, 2025, Movant's defense counsel successfully moved to remove location monitoring as a condition of Movant's pretrial release. (CDE 36)

On or about July 28, 2025, Probation interviewed Movant for purposes of his Presentence Investigation Report. (PSR ¶ 13). Movant's defense attorney was present. As reported in the PSR, Movant stated that he had heart surgeries in 2018 and 2023. "He conveyed that since these surgeries he has had multiple post medical complications and was prescribed high blood pressure medication." (PSR ¶ 65) "Graham reported no other history of medical issues[.]" (*Id.* at 66) During the interview, when asked about his mental well being, Movant addressed an incident he had in 2024 caused by anxiety and depression, but did not address anything before.

Probation released the PSR on or about August 15, 2025. (CDE43) On or about August 29, 2025, Movant's defense attorney timely filed Movant's objections. (CDE 29) The objections indicate a detailed review of the PSR. Movant and his counsel objected to approximately 18 paragraphs of the PSR, concerning topics ranging from the name of Movant's high school to other criminal conduct (a driving infraction). The filing addressed, in detail, Movant's physical and mental heath:

> In early 2018, Mr. Graham was diagnosed with Aortic Valve Insufficiency at Mayo Clinic. Tests revealed severe leakage (~50%) requiring eventual surgical intervention. He received open heart surgery in May 2018 at Mount Sinai Hospital. The valve leakage was reduced but had not stopped. He was placed on blood pressure medication to slow the rate of deterioration of the valve leakage. This affected his energy, memory, and behavior.
>
> In early 2022, further tests from Mount Sinai Medical Center showed worsening valve leakage. A second open heart surgery was required. This was conducted in September 2023 at Mount Sinai Hospital. They replaced his aortic valve with a

> bovine valve and this operation was successful. Mr. Graham has since been medication-free and has a clean bill of cardiac health. Undersigned counsel is providing Probation with medical records to supplement the above summary.

(CDE 45 p.3-4)

On or about September 11, 2025, Movant's defense attorney moved to allow Movant to self-surrender. (CDE 46) She also filed three letters of support on behalf of Movant. (CDE 47) One was from Movant's de facto stepdaughter. She wrote movingly that Movant had "been a steady presence in [her] life since [she] was a young child" and that the Movant played "a significant role in [her] upbringing." Movant visited her at college "frequently" and "made a point to stay involved in my life, even from afar." Movant also helped her through treatment during her battles with alcoholism. (CDE 47-1)

The second letter was from Movant's treating psychotherapist, Licensed Clinical Social Worker Brenna C. Wilmott. In her letter, Ms. Wilmott wrote that the Movant had "made great strides towards finding effective coping strategies for his major depressive disorder and generalized anxiety disorder" and that he "truly works hard during session to take accountability, show humility, and demonstrate remorse for the crime he committed." (CDE 47-2) Ms. Wilmott wrote, "If it were up to me alone, as his mental health provider, I would request the least and most lenient sentence." (*Id.*)

Finally, the Movant's former colleague and friend "for circa 40 years," Barry Nix, wrote a letter about the Movant's decorated financial career and Movant's "brilliant mind. (CDE 47-3) Nix shared the following:

- "He has an exceptional intellect, with rigorous reasoning and an unshakable worth ethic."
- "I know in the recent past of his relationship troubles with Courtney, who was the love of his life. I also know that he has suffered with psychological and physiological issues following 2 heart operations and the prescribed medication that

> followed. All of which has affected him mentally and his capacity to concentrate or work. I have no doubt that these issues might have been contributing factors towards, but there can be no excuse for, the crime that he committed."

- "Your Honor, Mr. Graham is a remarkably gifted person who has made a very bad series of choices that I cannot begin to fathom or remotely condone. But I believe that a greater good lies ahead, and that he truly wants to repent for his mistake and the actions he took. Helping others will be a good start."

(CDE 47-3)

*Sentencing Hearing*

The Court sentenced Movant on September 16, 2025. The parties agreed the Movant's total offense level was 28, based on a base offense level of 7; a specific offense characteristic of +18 pursuant to § 2B1.1(b)(1)(J) because the loss was more than $3.5 million but less than $9.5 million; a specified offense characteristic of +2 pursuant to § 2B1.1(b)(2)(A)(iii) because Movant's conduct resulted in substantial financial hardship to the victim; a victim-related adjustment of +2 pursuant to § 3A1.1(b)(1) because his victim was vulnerable; a +2 adjustment pursuant to § 3B1.3 because Movant abused a position of private trust; and -3 pursuant to §3E1.1 for accepting responsibility. With a Criminal History Category I, Movant's guidelines range was 78 to 97 months.

The government requested a sentence of 84 months. (Hr's Tr. at 7) The government highlighted the overwhelming greed underlying the offense, the vulnerability of the victim, and the trust the Movant violated. When asked why the government was not seeking a sentence at the top of the guidelines, the government stated that while such a sentence would be reasonable, Movant had taken responsibility and did not pose a risk of specific deterrence. (Hr's Tr. at 8)

Defense counsel asked for a sentence "significantly below the guideline range," 40 months (Tr. at 9) Defense counsel first argued that a shorter prison sentence would be appropriate so that Movant, whose "best earning years are in the near future," would be able to work to make Family

Member-1 whole. *Second*, defense counsel highlighted that Movant had no interactions with law enforcement prior to this, and that he had been a provider until the SEC disciplined him in 2015. Defense counsel stated that Movant's profession was Movant's "identity," and without working, "he became a different person." (Tr. at 11)

Next, defense counsel tried to explain the luxurious lifestyle that Movant had while stealing Family Member-1's money. Defense counsel explained that Movant lived well when he was earning a handsome salary, and failed the stop: "His life changed. But, unfortunately, his lifestyle didn't. He never told his partner that this was going on. He didn't tell anyone else that this was going on, that he did not have money." (Tr. at 11)

Next, counsel highlighted Movant's high moral character and his acceptance of responsibility. She stated that "that's reflected by him immediately taking personal responsibility and accepting responsibility for his actions in this case and not pushing this to trial to try to attempt to justify what he did." (Tr. at 13)

Last, counsel advised that Family Member-1 expressed at certain points in time that she did not want Movant to be incarcerated. Counsel recognized that Family Member-1 has been suffering from dementia.

Movant addressed the Court. He addressed his heart operations and the impact it had on him. He shared that after the surgery he lost much of his "zeal" and his "ability to work in any similar capacity." Not once does he address that he failed to appreciate the wrongness of what he was doing, or the need to continue spending millions and millions of dollars. (Tr. at 20) He added that he sleeps better knowing that, during that time, he invested in several valuable companies that should "fully replenish[]" Family Member-1's estate" "within the next 12 to 18 months." (Tr. 20-21)

Movant's family member, on her own behalf and behalf of Family Member-1, spoke and told the Court of the betrayal, the loss, and the difficulty of caring for Family Member-1 after Movant stole all of her money. She asked for the most severe punishment possible.

Finally, the Court sentenced Movant to 84 months' incarceration. The Court noted the "horrendous impact on a very vulnerable victim"; that she was "forced to move out of her assisted living facility"; "to date, that the defendant has made no effort to repay her or to step forward to deal with needs." (Tr. at 26-28) The Court added, "The defendant asked for a variance so he can pay restitution. I think that's a false hope." (26) And, "I don't think a variance is appropriate. I don't see anything in his personal circumstances or characteristics that would justify such a variance." Tr. at 27) The Court concluded, "I generally don't go above Government recommendation, and so I'm not going to do that here." (*Id.*)

*The Instant Motion*

On or around July 7, 2026, Movant moved to vacate his sentence, have the Court appoint an expert who can testify in his defense, appoint new counsel, and resentence him. He does not attack his guilty plea. He identifies five grounds on which he is being held in violation of the laws and Constitution of the United States. *First*, defense counsel violated his Sixth Amendment rights by failing to investigate and present medical and psychiatric mitigation. Movant believes that he was denied the opportunity to find a medical expert who could opine that over the course of six years, while he spent $8.4 million of his family member's money, he lacked sufficient autonomy such that the Court should and would give him a lower sentence. *Second*, defense counsel violated the Fifth Amendment by failing to retain a mental health expert to participate in movant's defense. *Third*, defense counsel violated the Sixth Amendment by failing to submit a sentencing memorandum. *Fourth*, defense counsel violated Movant's Sixth Amendment rights by failing to

adequately consult Movant about a possible appeal. *Fifth*, the government somehow violated the Mandatory Victims Recovery Act by failing to disclose to the Movant the existence of private, civil actions, initiated by non-government parties, against parties other than the defendant, outside the Southern District of Florida.

**STANDARD OF REVIEW**

The grounds for relief under 28 U.S.C. § 2255 are extremely limited. A movant is entitled to relief if the court imposed a sentence that: (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. 28 U.S.C. § 2255(a); *McKay v. United States*, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011) (citing § 2255(a)). Movant bears the burden of proof to establish that vacatur of the judgment is appropriate. *See Beeman v. United States*, 899 F.3d 1218, 1220–21 (11th Cir. 2018) (en banc).[1]

A prisoner challenging counsel's effectiveness must demonstrate that: (1) counsel's performance was deficient, and (2) a reasonable probability that the deficiency resulted in prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). Deficient performance requires Movant to demonstrate counsel's actions were unreasonable or fell below prevailing professional norms. *See Strickland*, 466 U.S. at 688. The *Strickland* deficiency prong does not require a showing of what the best lawyers would have done, but rather whether "[s]ome reasonable lawyer at trial could have acted as defense counsel acted in the trial at issue and not what 'most good lawyers' would have done." *Dingle v. Sec'y*, *Dep't of Corr*., 480 F.3d 1092,

---

[1] While a claim is procedurally defaulted if it could have been, but was not raised on direct appeal, claims of ineffective assistance of counsel may be raised for the first time in a § 2255 motion and are therefore not subject to procedural bar for failing to raise them on direct appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

1099 (11th Cir. 2007) (quoting *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004)). "Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" *Id.* (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir.1983)).

In examining counsel's performance, the Court should be "highly deferential." *Strickland*, 466 U.S. at 689.

*Strickland*'s prejudice prong requires Movant establish that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

If Movant cannot meet one of *Strickland*'s prongs, the Court need not address the other prong. *See id*. at 697; *Brown v. United States*, 720 F.3d 1316, 1326 (11th Cir. 2013). Bare and conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1332–33 (11th Cir. 2012).

## ARGUMENT

Movant's motion must be denied. To maintain a luxurious lifestyle, replete with spas, resorts, and opulent residences, Movant stole nearly every penny his vulnerable family member had. To get that money, he lied repeatedly to sophisticated financial professionals. He lied about what he was doing with the money; how he was investing it; how he was caring for his family member; how much money he would ultimately need; and when he would return it. He claims complications from heart surgery contributed to him committing the offense. And that if he had the chance to find and pay for a mental health professional, she would somehow explain that he should receive a lower sentence because, in essence, it wasn't his fault. His motion must be denied.

1. *Defense Counsel was Neither Deficient Nor Did Any Omission Result in Prejudice.*

Trial counsel's failure to apply for funds for a medical professional to opine on defendant's mental wellbeing while he was spending millions of dollars a year to travel the world does not come close to falling below an objective standard of reasonableness.

Defense counsel was not ineffective for failing to investigate and present medical and psychiatric mitigation. *First*, Movant's defense counsel did just this. In their interview with Probation, counsel had Movant talk about the heart surgery and its impact. (PSR ¶ 65) In her objections to the PSR, counsel detailed the medical treatment Movant received after the heart surgery and the impact it had on him. (CDE 29) During the sentencing hearing, counsel again highlighted Movant's heart operations and their impact. And perhaps most importantly, counsel filed a letter of support from Movant's psychotherapist, Licensed Clinical Social Worker Wilmott, who advocated on Movant's behalf. Ms. Wilmott wrote that Movant "truly works hard during session to take accountability, show humility, and demonstrate remorse for the crime he committeed" and that if "it were up to me alone, as his mental health provider, I would request the least and most lenient sentence." (CDE 47-3) The assertion that defense counsel failed to investigate and present medical and psychiatric mitigation is simply untrue.

*Second*, defense counsel was well within her lawful discretion to focus on more effective arguments. *See Williams v. Allen*, 598 F.3d 778, 790 (11th Cir. 2010) ("We have said before that '[c]ounsel must be permitted to weed out some arguments to stress others and advocate effectively.'") (quoting *Gaskin v. Sec'y, Dep't of Corr.*, 494 F.3d 997, 1003 (11th Cir.2007)). To have pursued Movant's now preferred line of argument, one would have to overcome two unlikely occurrences. One, that defense counsel could find a medical "expert" who could opine on Movant's mental state in the past, over the course of six continuous years, at a time when Movant

no longer suffered the alleged affliction. To make matters more challenging, and less believable, during the time of this alleged "zombie state," Movant served as a reliable stepfather; supporting partner; strong friend; successful investor; world traveler; and seller of valuable real estate. Defense counsel would have to find an expert who could opine that despite being able to accomplish all of this, Movant still somehow lacked the ability to appreciate the wrongness of his conduct.[2] Two, that the Court would allow precious Criminal Justice Act monies to spent on such an "expert." *See Chandler v. United States*, 218 F.3d 1305, 1317 (11th Cir. 2000) ("[N]o absolute duty exists to investigate particular facts or a certain line of defense. Under *Strickland*, counsel's conducting or not conducting an investigation need only be reasonable to fall within the wide range of competent assistance."). Defense counsel was not ineffective for failing not to pursue an "expert."

*Third*, defense counsel strategically and successfully presented Movant as someone accepting responsibility for his heinous crime and ready to move forward. Defense counsel highlighted that Movant was eager to work to repay his family member, and that allowing him to work served as the best reason to minimize his incarceration. Seeking funds to hire an "expert" to argue that Movant didn't appreciate the wrongness of his conduct would have undercut this argument and likely solicited a request for a longer sentence from the government.

Defense counsel's assistance was clearly not ineffective. Even if it were, Movant was not prejudiced. He received a sentence in the middle of the Guidelines. The Court considered his

[2] Movant does not cite how such testimony could in fact mitigate his culpability. U.S.S.G. § 5K2.13 (Diminished Capacity) shows that it would likely be impossible. For a downward departure, Movant would have to show that he suffered from a "significantly reduced mental capacity" and that such reduced mental capacity "contributed substantially" to his commission of the offense. No expert would be able to opine that being in a "zombie state" "contributed substantially" to perpetrating a four year, eight-million-dollar fraud.

medical history and his request for a below Guidelines request and found that it was not deserved. A medical "expert" raising the same facts would not have changed it. If anything, it would have showed the Court that Movant had not actually taken responsibility and led to a longer sentence. Even if defense counsel were able to find such an "expert," it would not have improved Movant's sentence.

2. *Movant's Fifth Amendment Rights Were Not Violated.*

Movant's Fifth Amendment due process rights were not violated. He received all of the rights afforded criminal defendants. His attorney participated in his Presentence Investigation Report interview; she filed detailed objections to the draft PSR; she collected and submitted multiple letters of support on behalf of the Movant; and she advocated effectively and thoroughly during the sentencing hearing, including by presenting mitigation evidence. He received a fair hearing and a fair result.

3. *Defense Counsel Was Not Ineffective For Refraining From Filing A Sentencing Memorandum.*

Courts consistently find that failing to file a sentencing memorandum is not ineffective assistance of counsel. *See, e.g., United States v. Lian*, F. 391 App'x 969 (11th Cir. 2010) ("While counsel did not submit a sentencing memorandum, he did advocate on Lian's behalf, highlighting Lian's clean record and employment history in the period following the charged conduct, his marriage, the birth of his child, and his remorse for his crimes as evidence that Lian had 'completely changed his life around,' warranting mitigation of sentence."); *Klatch v. United States*, 8-cv-778-T-27JSS, 2019 WL 6051438 (M.D. Fla. Nov. 15, 2019) (failing to file a sentencing memorandum is not ineffective when counsel files objections to a PSR).[3] As shown above,

[3] Movant argues throughout each argument that defense counsel failed to introduce any mitigation at sentencing. *See, e.g.*, Motion p. 18. As shown above, this is factually inaccurate.

counsel presented Movant's defense and mitigation through objections to the PSR, letters of support, and an oral argument during the sentencing hearing. The decision not to file a sentencing memorandum does not render that advocacy ineffective.

4. *Defense Counsel Consulted Movant About a Possible Appeal. He Has Still Failed to Identify An Appellate Issue.*

Despite arguing that defense counsel failed to consult with him about an appeal, Movant admits that defense counsel did just that: consult with Movant about an appeal. He writes that defense counsel met with Movant shortly after sentencing and shortly after Movant contacted her. (Motion p. 8) Counsel correctly advised Movant that he had fourteen days to appeal. (*Id.*) Counsel accurately advised Movant that he had no grounds on which to appeal. (*Id.*) Movant now claims this is a failure to consult. He is wrong. Had Movant wanted to appeal, he could have done so himself, just as he filed in instant motion. Further, Movant has failed to identify an appellate issue. Given that his underlying complaint is with defense counsel, this is the appropriate vehicle for him to seek redress. *See Massaro v. United States*, 538 U.S. 500, 504 (2003).

5. *The MVRA Does Not Apply to Movant.*

In an argument that is difficult to follow, Movant claims that the government violated the Mandatory Victims Rights Act by failing to advise him of litigation involving non-governmental parties outside the Southern District of Florida. Movant is, obviously, not a victim of his offense. He does not have a right of action under the MVRA.

## CONCLUSION

For the reasons set forth above, Movant's motion should be denied.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: *s/ Eli S. Rubin*
ELI S. RUBIN
Assistant United States Attorney
Court ID No. A5503535
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9247
Email: Eli.Rubin@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 28, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and subsequently mailed a copy to Movant.

*/s/ Eli S. Rubin*
Eli S. Rubin